## WILLETTS *et al. v.* HATCH.

*(Common Pleas of New York City and County, General Term.* June 16, 1890.)

PLEDGE—CARE OF GOODS—DUTY OF PLEDGEOR.

Although the delivery of a warehouse receipt to the pledgee gives him the right to the exclusive and absolute control of the goods pledged, if he chooses to exercise that right, yet, where he does not claim or exercise such right, and the pledgeor has free access to the goods, it is equally the duty of the pledgeor to care for them when he knows they are in danger, and make the damages as little as possible, and, where he fails to do so, he cannot hold the pledgee responsible for the loss.

Appeal from trial term.

Action by John T. Willetts and others against Orimel C. Hatch. Defendant appeals from a judgment entered in favor of plaintiffs upon the verdict of a jury.

Argued before LARREMORE, C. J., and BOOKSTAVER, J.

*John McDonald, (John H. Post,* of counsel,) for appellant. *W. M. Powell,* for respondents.

BOOKSTAVER, J. This action was brought to recover a balance for money loaned the defendant, amounting to $2,117.38, with interest. On the trial the defendant admitted plaintiffs' claim, but insisted on an offset of $1,703.38 under a counter-claim set up in the answer, wherein it was alleged that certain wet-salted calf-skins, pledged to plaintiffs as collateral security for the loan, had become damaged to the last-named amount through the neglect of the plaintiffs to properly care for and preserve them while under their custody and control. There is no real dispute as to the facts in this case. When the loan was made in July, 1886, the skins, although in the port of New York, were not actually warehoused. By plaintiffs' direction and with defendant's acquiescence, they were sent to the warehouse of Schultz, Innis & Co., in Cliff street, the same warehouse in which defendant had before stowed other skins belonging to him. Schultz, Innis & Co., upon receiving the goods, issued a negotiable warehouse receipt therefor to the defendant, who indorsed it in blank, and delivered it to the plaintiffs as collateral security for the loan, and they retained possession of it. But the warehousemen, during all the time the skins remained in their possession, treated the defendant as the owner, and addressed all communications relating to them to him. The skins remained in that warehouse until July 22, 1887, when they had become so badly damaged that Schultz, Innis & Co. ordered them to be removed from their store. They were then brought by defendant's cart-man to plaintiffs' store or cellar, and, in order to enable the defendant to do so, the plaintiffs gave him the warehouse receipt, which was afterwards returned to them. While in their store the skins were cared for by defendant's men under his direction. Afterwards, defendant directed the plaintiffs to sell them, which, as soon as possible after receiving such direction, they did, to a man in Easton, Pa. The price first agreed upon was $700 cash, but, when the goods were examined at Easton, they were found so bad that the purchaser refused to pay that price, and threatened to send them back, whereupon the plaintiffs agreed to take $400 for them, that being the best price which could be realized. No actual negligence is charged against the plaintiffs, but appellant claims that

because the respondents held the warehouse receipt, which gave them the absolute custody and control of the goods, they were bound to exercise ordinary care and prudence in looking after the skins, and preventing damage to them, and are liable because they did not.

No rule of law is better settled than that a pledgee, when he has exclusive possession and control of the pawn, is bound to use ordinary diligence in the care and preservation of it. It is equally well settled that the indorsement and delivery of a warehouse receipt, either in blank or to the pledgee, gives him the right to the exclusive and absolute control of the goods pledged, if he chooses to exercise that right; and it is on these rules that the defendant relies for a recovery on his counter-claim. But there is no evidence in the case that plaintiff ever claimed or exercised the right of exclusive possession or absolute control given them by law. On the other hand it appears that the defendant saw the skins on the dock, examined them as they went into the warehouse of Schultz, Innis & Co., and made a thorough examination of them in the warehouse, and found them in good condition. After that, he had free access to them, tried to sell them, and often took persons there for that purpose, and showed them to such persons. He testifies he saw them at least once a week during every month, down to April, 1887, and did not discover any evidence of damage; that they were doing well until he became ill, in April. He did not again see them until the latter part of May, 1887, when he found them beginning to heat, but he did not report this to the plaintiffs until some time in June. He then notified them of the fact, and apparently expected them to actively engage in preventing further deterioration, simply because they were pledgees, although he, the owner of the goods, did absolutely nothing to preserve them, notwithstanding he had free access to them, and, as far as appears from the testimony, could have resalted or aired them. They were left by him in the condition he found them, although notified by the warehousemen they were being injured, merely giving the letter containing such notification to the plaintiffs as if they had the sole duty to look after them and he had none. They were not finally removed until ordered away by Schultz, Innis & Co., when he removed them to plaintiffs' cellar, which was the first time they ever saw them or had actual custody of them, and even then they gave him the fullest liberty to do whatever he thought necessary to arrest decomposition. It is true that meanwhile he requested the plaintiffs to have them tanned on their own account. He also requested that the skins should be removed to his own store-house, and in that event he offered to give his own warehouse receipt for them. But it is clear that it is not a pledgee's duty to tan hides in order to preserve them, and the latter request required a greater confidence in human nature as it is to-day, than the plaintiffs' were bound to exercise. Again, the defendant testified that the 458 bundles of skins in question were piled in one compact mass, and that the tops of the bundles would naturally cool when they were exposed to the air, while the middle and bottom of the mass "might be red hot so it would burn the strings off," and one would not discover it until he attempted to get to the bottom of the pile, and that for that reason it is necessary to turn the pile bottom side up in order to keep rot from the lower part of the mass, and because that was not done he assigns as a reason why he did not discover the fermentation before, and which probably had been going on for some time. But he swears he made no attempt to turn the mass bottom up; that he never did more than take one bundle up at a time to show customers, as he was generally in a hurry. We think it was quite as much his duty to do this work when he had the right and power to do it, as it was incumbent upon the plaintiffs, and their neglect was certainly no greater than his own. Even if it were the duty of the pledgees to use ordinary care under the circumstances above mentioned, and they failed to do it, it was equally the duty of the pledgeor, when he knows the danger, as he did in this case, to make the damages as little as possible

to his own property. The law does not permit him to sit by with folded hands seeing the danger and doing nothing to avert it when he had the power to do so. At the close of the testimony the defendant asked the court to direct a verdict for the plaintiffs, less the amount of defendant's counter-claim of $1.703.75, for damages arising, as he claimed, from plaintiffs' neglect of duty. This was upon the theory that the mere warehouse receipt gave the plaintiffs exclusive possession and control of the hides in question, and carried with it the right to damages for any neglect on their part to exercise ordinary prudence in the care of the skins. But, as before shown, plaintiffs never claimed to exercise this right, and the defendant had freer access to the goods, and a greater opportunity to care for them than they had, and we think the court very properly refused to give such direction. To have done so would have put a premium upon defendant's negligence, and, in effect, would have enabled him to sell the skins to the pledgees at a price greater than he had been able to obtain for them in the open market, as he had been more than a year trying to sell them. Had the plaintiffs requested the direction of a verdict in their favor, it would have been probably granted, as there was only a question of law involved upon the undisputed facts in the case. But, in the absence of such a request, the case was properly submitted to the jury, the court charging them, among other things, that the plaintiffs had the warehouse receipt, and had the legal or constructive possession or custody of the skins, but did not have the actual custody of them; and the question that it left to the jury was: "Were they bound any more than the pledgeor or borrower to care for these goods, that is, to do the salting or ventilating, or any other thing that was necessary to be done to them? Did they assume, when they loaned the money upon the warehouse receipt, to do those things, which the defendants say they ought to have done, to the skins? If they did, and if they neglected any duty to them, then they would be responsible. If they did not, then they would not be responsible." This, we think, was entirely proper under the circumstances, and as favorable to the defendant as he could have asked. The jury rendered a verdict in favor of the plaintiffs, and, we think, with justice. On the trial, the defendant, relying upon his theory, as above set forth, and the absolute liability of the plaintiffs by reason of their holding the warehouse receipt, endeavored to exclude evidence tending to show that the plaintiffs never had the actual possession of the calf-skins until they came to their store in July, 1887; but, we think, in view of the facts before stated, the court properly admitted such evidence, and it was pertinent to the issues then to be tried. So, too, and for the same reason, the court properly admitted evidence tending to show that the plaintiffs had no notice of the condition of the skins up to a certain date. The court did not err in allowing the amendment to the reply to conform to the proofs. The other exceptions argued before us were based upon the erroneous theory contended for by the defendant, and were not well taken. The judgment should therefore be affirmed, with costs.